The STATE of OHIO, Appellant,

v.

WILLIAMS, Appellee.

[Cite as *State v. Williams* (1994), 94 Ohio App.3d 538.]

Court of Appeals of Ohio,
Cuyahoga County.

No. 65564.

Decided May 2, 1994.

*Stephanie Tubbs Jones,* Cuyahoga County Prosecuting Attorney, and *Scott G. Salisbury,* Assistant Prosecuting Attorney, for appellant.

*George F. Lonjak,* for appellee.

---

*Per Curiam.*

This cause came on to be heard upon the accelerated calendar pursuant to App.R. 11.1 and Loc.R. 25, the records from the Cuyahoga County Court of Common Pleas, the briefs and the oral arguments of counsel. Pursuant to Crim.R. 12(J) and R.C. 2945.67, the state of Ohio timely appeals from the lower court's decision granting the motion to suppress evidence filed by defendant-appellee, Randy L. Williams. For the reasons that follow, we reverse and remand for further proceedings.

Det. Gary Garisek testified on behalf of the state of Ohio at appellee's motion hearing. Det. Garisek has eight years of experience with the Cleveland Police Department and is currently assigned to the homicide unit. On December 12, 1992, however, Det. Garisek was assigned to the Sixth District Strike Force. Det. Garisek had such assignment for a little over one year.

On the date in question, Det. Garisek and his partner, Det. Nolan, were dressed in plain clothes, investigating drug and open container complaints. At

approximately 9:00 p.m., they were in the area of East 140th Street and McElhattan, an area well known to them for high drug sales and violent crimes. After making a left-hand turn from East 140th to McElhattan, Det. Garisek had to stop his vehicle because a 1980 Chevette was parked in the middle of the street. They remained behind the Chevette for about fifteen seconds, unable to go around due to legally parked cars in the other lane, before Det. Garisek activated the overhead lights and pulled the vehicle over to the curb. As Det. Garisek approached the driver's side of the vehicle, he observed the driver, later identified as appellee, make a furtive movement toward the floor beneath him. For protection, Det. Garisek ordered everyone out of the vehicle and to the curb where Det. Nolan was standing. Det. Garisek then went into the vehicle, looked under the seat in an area where he had observed appellee reach, and observed a metal crack pipe containing suspected cocaine residue.

Det. Garisek placed appellee under arrest for violation of the state drug law and advised him of his constitutional rights. Appellee was issued a citation for impeding the flow of traffic by being parked in the middle of the street. The vehicle was subsequently released to appellee's female companion.

Det. Garisek explained that when he looked under the seat, he was looking for a weapon. Det. Garisek testified that, in the past, he has recovered weapons in similar searches. He observed the crack pipe "right under the seat, right between the legs [of the driver] on the floor." Det. Garisek further testified that he observed the pipe immediately upon looking under the seat.

Finally, Det. Garisek stated he turned over appellee's car to appellee's female companion at his request. Det. Garisek explained that the female rode in the front passenger seat while a male rode in the back seat. Neither of the passengers made any furtive movements as the detectives approached appellee's car. Moreover, both of appellee's passengers were released.

On cross-examination, Det. Garisek clarified that as they drove onto McElhattan, the detectives observed appellee's car stopped in the middle of the street so that they could not get around appellee's car. Further, Det. Garisek's suspicion was not aroused until he and Det. Nolan approached the vehicle and observed appellee make a furtive movement. As Det. Garisek searched the automobile for his protection, appellee and his passengers stood by the curbside.

Finally, upon inquiry from the court, Det. Garisek explained:

"THE COURT: Why didn't you just flash the guy and have him get out of the middle of the street and drive on? Why do anything more than just pull him over?

"THE WITNESS: We could have done that, but we chose to possibly issue a citation at that time as an offense. It's impeding the flow of traffic. If a vehicle

coming from the north on 140th was to make a turn onto McElhattan, a right hand turn, he would have never seen us stopped right there and we would have gotten rear ended.

"THE COURT: Why not chew him out?

"THE WITNESS: I believe we did that too."

Appellee, a twenty-eight-year-old construction worker, testified on his own behalf. Appellee explained that on the night in question, he went to a Christmas party put on by a former employer. At some point in the evening, appellee met a woman who asked him to give her a ride to a friend's house. The woman gave him directions and instructed him to exit I–90 at the East 140th Street exit. Appellee stated that as he made a left-hand turn off East 140th, the woman saw a black man, whom she knew, walking down the street. Appellee stopped the car, and the black man got into the back seat. Appellee said he drove away after picking up the male, but was eventually pulled over by the police officers.

After appellee pulled over, one of the officers came up to the passenger door and asked him to step out of the car. Appellee complied, and the officer searched underneath the front seat. The police officer searched appellee as well. Appellee added that his two passengers remained in the car. Subsequently, appellee was asked by one of the officers what he was doing in the area and if he was buying crack cocaine. Appellee told the officer he was driving the woman to a friend's and that he was not buying crack cocaine. The police officer accused appellee of lying and showed appellee the metal pipe which appellee called a "stem." Appellee denied that the pipe was his and maintained that he had never seen it before.

Appellee also testified that he overheard the police officers talking about "watching the black man because he was selling drugs." Appellee added that he overheard one of the officers state that "he [the black man] lived somewhere around there and he was selling crack cocaine." Appellee added that after the woman, who he said he had met only three hours earlier, volunteered to drive his car back to the bar, appellee agreed, and the police did not have his car towed.

Based on the foregoing testimony, the trial court granted appellee's motion to suppress. The trial court expressed skepticism that a city traffic ordinance prohibited an automobile from stopping in the street. The court rationalized as follows:

"So I'm quit [sic] stunned to be told that's a traffic violation that could get you cited.

"And that's one of the reasons I'd like to see the ordinance because I'd hate to see this applied in any particular way. Indeed, I want to say quite candidly that

I'm skeptical of the testimony here that says the two detectives are enforcing the traffic laws.

"If they came in here and said we thought this was a drug transaction and we saw people near a house that we were suspicious of and the whole thing looked suspicious, then we could start to examine the question of whether there was probable cause for a drug transaction.

"I believe that if you made that argument, they stopped him because they thought they were there to engage in a drug transaction, I will look much more seriously at this.

"Therefore I have a lot of doubts that the real reason for this stop was a traffic violation, to take such extraordinary actions.

"And obviously because I have doubts about that, I'm left with further doubts about whether anything like this can be justified on the old saw that we have come in here with what was a Terry stop.

"And frankly, I'm not left with confidence that that happened here. And I would much rather hear the testimony that it was a drug area and it looked to us it was a drug deal. We wanted to stop him and look at him.

"Then I'm told here it was a traffic violation. I don't believe it was a traffic stop violation. So I'm going to grant the motion to suppress."

The state of Ohio timely appeals, raising the following sole assignment of error for our review:

"The trial court erred in ruling that impeding the flow of traffic is not a traffic violation, thereby making a stop for this offense illegal and granting defendant's motion to suppress."

Appellant, the state of Ohio, maintains that Det. Garisek engaged in a routine traffic stop which was followed by a protective search pursuant to *Terry v. Ohio* (1968), 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889. The trial court, however, did not believe that the detectives engaged in a traffic stop based on the court's disbelief that impeding the flow of traffic was a violation which could get a person cited. The record before this court, however, clearly reveals that the detectives engaged in a routine traffic stop for impeding the flow of traffic, which was followed by a permissible *Terry* stop and search.

The Fourth Amendment[1] prohibits only those searches and seizures which are unreasonable. *Harris v. United States* (1947), 331 U.S. 145, 67 S.Ct. 1098, 91

---

1. Similarly, Section 14, Article I of the Ohio Constitution protects the same interests in a manner consistent with the Fourth Amendment to the United States Constitution. *State v. Andrews* (1991), 57 Ohio St.3d 86, 87, 565 N.E.2d 1271, 1273, fn. 1.

L.Ed. 1399; *State v. Smith* (1978), 56 Ohio St.2d 405, 10 O.O.3d 515, 384 N.E.2d 280. A warrantless search is "per se unreasonable" and can be justified only if it falls within one of the "jealously guarded and carefully drawn" exceptions to the Fourth Amendment warrant requirement. *Arkansas v. Sanders* (1979), 442 U.S. 753, 759–760, 99 S.Ct. 2586, 2590–2591, 61 L.Ed.2d 235, 241–243; *Katz v. United States* (1967), 389 U.S. 347, 357, 88 S.Ct. 507, 514, 19 L.Ed.2d 576, 585. An exception to the warrant requirement is set forth in *Terry v. Ohio, supra.* In *Terry*, the United States Supreme Court held that a police officer may make a brief, warrantless investigatory stop of an individual without probable cause where the police officer reasonably suspects that the individual is or has been involved in criminal activity. The Supreme Court stated:

" * * * We merely hold today that where a police officer observes unusual conduct which leads him reasonably to conclude in light of his experiences that criminal activity may be afoot and that the persons with whom he is dealing may be armed and presently dangerous, where in the course of investigating this behavior he identifies himself as a policeman and makes reasonable inquiries, and where nothing in the initial stages of the encounter serves to dispel his reasonable fear for his own or others' safety, he is entitled for the protection of himself and others in the area to conduct a carefully limited search of the outer clothing of such persons in an attempt to discover weapons which might be used to assault him." *Id.*, 392 U.S. at 30, 88 S.Ct. at 1884–1885, 20 L.Ed.2d at 911.

In the present case, the trial court did not believe that impeding traffic was a violation which could get a person cited. Consequently, the court did not believe the officers had probable cause to stop appellee. While an appellate court will give great deference to the factual findings of a trial court, an appellate court must independently determine, as a matter of law, whether the trial court erred in applying the substantive law to the facts of the case. *State v. Klein* (1981), 73 Ohio App.3d 486, 488, 597 N.E.2d 1141, 1142–1143. In applying the substantive law to the facts *sub judice*, the record clearly reveals that the detectives had probable cause to stop appellee for impeding traffic.[2] Moreover, once appellee was pulled over for the traffic violation, and upon Det. Garisek's observation of appellee making furtive gestures, Det. Garisek was justified in asking appellee to step out of the vehicle and conducting a limited weapons search of the car.

---

2. R.C. 4511.22 states in pertinent part:

"(A) No person shall stop or operate a vehicle, trackless trolley, or street car at such a slow speed as to impede or block the normal and reasonable movement of traffic, except when stopping or reduced speed is necessary for safe operation or to comply with law."

Additionally, Cleveland Codified Ordinance 433.04 provides, in pertinent part:

"(a) No person shall operate a vehicle at such a slow speed as to impede or block the normal and reasonable movement of traffic, except when reduced speed is necessary for safe operation or to comply with law."

■ Initially, we note that Det. Garisek's request that appellee and his passengers step out of the automobile during a routine traffic stop is proper even without suspicion of further criminal activity. See *Pennsylvania v. Mimms* (1977), 434 U.S. 106, 98 S.Ct. 330, 54 L.Ed.2d 331, and *State v. Evans* (1993), 67 Ohio St.3d 405, 407, 618 N.E.2d 162, 165; see, also, *State v. Ferrise* (Minn.1978), 269 N.W.2d 888; *People v. Robinson* (1989), 74 N.Y.2d 773, 545 N.Y.S.2d 90, 543 N.E.2d 733; *Warr v. State* (Ind.App.1991), 580 N.E.2d 265; and *People v. Maxwell* (1989), 206 Cal.App.3d 1004, 254 Cal.Rptr. 124, for cases extending a *Mimms* order to passengers of lawfully stopped automobiles. However, a *Mimms* order does not automatically bestow upon a police officer the authority to conduct a pat-down search for weapons. *Mimms, supra;* and *Evans, supra.* The inquiry, therefore, becomes whether, based on the totality of the circumstances, the officers had a reasonable, objective basis for conducting a search for weapons once the defendant was ordered out of the car. *Id.;* see, also, *State v. Andrews* (1991), 57 Ohio St.3d 86, 565 N.E.2d 1271.

In this regard, we believe the United States Supreme Court decisions in *Pennsylvania v. Mimms, supra,* and *Michigan v. Long* (1983), 463 U.S. 1032, 103 S.Ct. 3469, 77 L.Ed.2d 1201, are authoritative. In *Mimms,* the Supreme Court upheld a weapons frisk of an individual during a routine traffic stop. In that case, the defendant was asked to step out of the vehicle. As Mimms stepped out of the vehicle, the requesting officer observed a large bulge in Mimms' sports jacket. The officer conducted a weapons frisk and discovered a handgun. The court held that "the bulge in the jacket permitted the officer to conclude that Mimms was armed and thus posed a serious and present danger to the safety of the officer. In these circumstances, any person of 'reasonable caution' would likely have conducted the 'pat down.'" *Mimms, supra,* 434 U.S. at 112, 98 S.Ct. at 334, 54 L.Ed.2d at 338.

Moreover, the Supreme Court recognized the risk to police even during a routine traffic stop. The court stated:

"We think it too plain for argument that the State's proffered justification—the safety of the officer—is both legitimate and weighty. 'Certainly it would be unreasonable to require that police officers take unnecessary risks in the performance of their duties.' *Terry v. Ohio, supra,* [392] U.S. at 23, 88 S.Ct. at 1891 [20 L.Ed.2d at 907.] And we have specifically recognized the inordinate risk confronting an officer as he approaches a person seated in an automobile. 'According to one study, approximately 30% of police shootings occurred when a police officer approached a suspect seated in an automobile. Bristow, Police Officer Shootings—A Tactical Evaluation, 54 J.Crim.L.C. & P.S. 93 (1963).' *Adams v. Williams,* 407 U.S. 143, 148, 92 S.Ct. 1921, 1924, [32 L.Ed.2d 612 [618, n. 3] (1972). We are aware that not all these assaults occur when issuing traffic

summons, but we have before expressly declined to accept the argument that traffic violations necessarily involve less danger to officers than other types of confrontations. *United States v. Robinson*, 414 U.S. 218, 234, 94 S.Ct. 467 [476] 38 L.Ed.2d 427 [440] (1973). Indeed, it appears 'that a significant percentage of murders of police officers occurs when the officers are making traffic stops.' *Id.* at 234, 94 S.Ct. at 476 [38 L.Ed.2d at 440 n. 5.]" *Id.* 434 U.S. at 110, 98 S.Ct. at 333, 54 L.Ed.2d at 336–337.

Likewise, in *Michigan v. Long, supra*, the Supreme Court upheld a weapons search of the interior of a vehicle during a traffic stop, which revealed an open pouch containing suspected marijuana. The Supreme Court noted, "in this case, the officers did not act unreasonably in taking preventative measures to ensure that there were no other weapons within Long's immediate grasp before permitting him to reenter his automobile. Therefore, the balancing required by *Terry* clearly weighs in favor of allowing the police to conduct an area search of the passenger compartment to uncover weapons, as long as they possess an articulable and objectively reasonable belief that the suspect is potentially dangerous." *Id.*, 463 U.S. at 1051, 103 S.Ct. at 3482, 77 L.Ed.2d at 1221.

The Ohio Supreme Court's decision in *State v. Smith* (1978), 56 Ohio St.2d 405, 10 O.O.3d 515, 384 N.E.2d 280, is also controlling. In *Smith*, the Supreme Court held in its syllabus:

"Where a police officer stops and approaches a motor vehicle at night for a traffic violation (running a red light) and sees the driver, while exiting the car, furtively conceal something under the front seat, a limited search of that area is reasonable for the purpose of the officer's protection. (*Terry v. Ohio*, 392 U.S. 1 [88 S.Ct. 1868, 20 L.Ed.2d 889]; *Adams v. Williams*, 407 U.S. 143 [92 S.Ct. 1921, 32 L.Ed.2d 612]; *Chimel v. California* 395 U.S. 752 [89 S.Ct. 2034, 23 L.Ed.2d 685], controlling.)"

In the case *sub judice*, as Det. Garisek made a left-hand turn onto McElhattan, he had to stop his vehicle due to appellee's 1980 Chevette being parked in the middle of the street. Det. Garisek explained, "If a vehicle coming from the north on 140th was to make a turn onto McElhattan, a right hand turn, he would have never seen us stopped there and we would have been rear ended." Det. Garisek remained behind the Chevette, unable to proceed around for about fifteen seconds due to legally parked cars in the other lane, before activating the overhead lights and pulling appellee to the curb. Det. Garisek approached appellee's vehicle at night, in an area known for drug trafficking and violent crimes, and observed appellee furtively reach underneath the driver's seat. Det. Garisek asked appellee and his passengers to step outside the vehicle and proceeded to conduct a limited search underneath the driver's seat, where he discovered the crack cocaine pipe.

This court has previously upheld a search of an automobile where the initial detainment of the car by the police officers was warranted on the grounds that the officers observed the defendant's car "impeding traffic." *State v. Newsome* (1990), 71 Ohio App.3d 73, 593 N.E.2d 40. In *Newsome*, we noted that "[o]nce the stop was made, Officers Tinsley and Wheeler were entitled to conduct a limited search for weapons and were justified in conducting a limited protective search of the surrounding area within such individual's control." *Id.* at 77, 593 N.E.2d at 43, citing *Michigan v. Long* (1983), 463 U.S. 1032, 103 S.Ct. 3469, 77 L.Ed.2d 1201.

Similarly, in *State v. Almalik* (1987), 41 Ohio App.3d 101, 534 N.E.2d 898, this court upheld a stop and search prompted by the police officer's initial observation of the defendant violating a local traffic ordinance. In *Almalik*, we held:

"Where police officers observed the defendant violate a local traffic ordinance and stopped his vehicle, noticed the defendant making furtive gestures as he stopped, the officers were in a high crime area when they observed the defendant's suspicious movements and were concerned for their safety, the weapon in question was found in the 'lunge area' of the defendant while he was in the driver's seat of his automobile, one of the officers observed the butt of the gun in plain view underneath the driver's seat after the defendant exited the vehicle, and another officer felt the gun while he was searching in that area and retrieved the gun, the record supports the reasonableness of the warrantless search and also defendant's conviction for carrying a concealed weapon." *Id.* at paragraph two of the syllabus. See, also, *State v. Moncrief* (1980), 69 Ohio App.2d 51, 23 O.O.3d 61, 431 N.E.2d 336, paragraph three of the syllabus.

Accordingly, we hold that upon observing appellee's vehicle impeding traffic, Det. Garisek was justified in stopping appellee by motioning him to the curb and approaching appellee's vehicle, and, when Det. Garisek observed appellee in an area known for drug trafficking and violent crimes make a furtive movement by reaching underneath the driver's seat, Det. Garisek was constitutionally permitted to require appellee and his passengers to exit the vehicle and conduct a limited search for weapons of the automobile.

■ Finally, we note that Det. Garisek's discovery of the crack cocaine pipe cannot be suppressed on the basis that the scope of the search exceeded that which is permitted pursuant to *Terry v. Ohio, supra.* Det. Garisek testified that as he went into the vehicle, he looked under the seat, in an area where he observed appellee reaching, and observed the metal crack cocaine pipe containing the suspected cocaine residue. It is well settled that "if, while conducting a legitimate *Terry* search * * *, the officer should, as here, discover contraband, other than weapons, he clearly cannot be required to ignore the contraband, and the Fourth Amendment does not require its suppression in such circumstances."

*Michigan v. Long* (1983), 463 U.S. 1032, 1050, 103 S.Ct. 3469, 3481, 77 L.Ed.2d 1201, 1220, citing *Coolidge v. New Hampshire* (1971), 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564.

Therefore, based on the foregoing, we conclude the trial court committed reversible error in granting appellee's motion to suppress evidence. Appellant's sole assignment of error is sustained.

The judgment is reversed, and this cause is remanded for further proceedings.

*Judgment reversed*
*and cause remanded.*

KRUPANSKY and NUGENT, JJ., concur.

HARPER, P.J., dissents.

HARPER, Presiding Judge, dissenting.

I respectfully dissent from the majority's decision in this case that the trial court committed reversible error in granting Randy Williams' motion to suppress. I would have affirmed the trial court's decision based upon the following interpretation of the trial court's reasoning for granting the motion to suppress.

The state contends that the trial court erred in concluding "impeding the flow of traffic" is not a traffic violation. According to the state, as a result of this finding, the trial court expanded its error by granting the motion to suppress on an erroneous conclusion.

The majority accepts the state's argument, and, therefore, independently determines whether the trial court erred in applying the substantive law to the facts of this case. Finding that Detectives Garisek and Nolan properly stopped Williams for impeding traffic under R.C. 4511.22 and Section 433.04 of the Cleveland Codified Ordinances, the majority then finds that Det. Garisek was justified in conducting a limited weapons search of the car after observing "furtive gestures."

The majority's analysis is an accurate and in-depth discussion of the law concerning a police officer's right to stop a vehicle for a traffic violation, to order the driver out of the car, and to conduct a search of the car if warranted under the circumstances. However, the analysis misses what I view is the main issue in this case, *i.e.*, whether the trial court believed Det. Garisek's testimony at all. Whether Williams' "impeding the flow of traffic" allowed the traffic stop, and whether his "furtive gestures" justified the subsequent search are irrelevant. A simple review of the record reveals the majority's crucial error.

The trial court had a difficult time with determining why the detectives thought Williams committed a traffic violation. First, the court asked Det. Garisek what

ordinance was violated by Williams' vehicle sitting in the street. No ordinance was cited, as the state argued that it did not matter whether Williams actually violated an ordinance; what mattered was the detectives' belief that there was a traffic violation. Since no ordinance could be cited to support a "lawful stop," the trial court elaborated and then concluded:

"THE COURT: We have three Cleveland police detectives as I understand it in a—I mean two Cleveland police detectives, narcotic detectives on patrol in an area that they regard as worthy of patrolling because of the level of incidents of law violations in which they regard as dangerous in a high crime area. They make a turn onto this street because there had been drug trafficking on the street.

"I guess you're just taking a look and you see a car stopped in the middle of the street. They honk the horn. The defendant has testified he didn't hear any car. He said he was moving before he became aware that anybody was even behind him and denies that he was stopped there at the time, which incidentally is not really inconsistent with what the detective testified to.

"If he didn't know the officer was behind him, then he would have no way of knowing that.

"But when the flashers were put on, he pulled over.

"The officer himself testified that it was only a matter of seconds that the car was there. He saw him in a stopped position.

"As is said in our dialogue here, I don't know what this ordinance is that supposively [sic] he violated.

" * * *

" * * * *I'm skeptical of the testimony here that says the two detectives are enforcing the traffic laws.*

" * * * *

" * * * *I have a lot of doubts that the real reason for this stop was a traffic violation,* to take such extraordinary actions.

"And obviously because I have doubts about that, I'm left with further doubts about whether anything like this can be justified on the old saw that we have come in here with what was a Terry stop.

"And frankly, I'm not left with confidence that that happened here. * * *

"Then I'm told here it was a traffic violation. *I don't believe it was a traffic stop violation.* So I'm going to grant the motion to suppress." (Emphasis added.)

It is apparent from this discourse that the trial court was influenced by the fact that the detectives were in the "high crime" area in order to investigate drug sales taking place on the very street on which they stopped Williams. The trial court also recognized that Williams' vehicle was stopped very briefly. Finally, the trial court expressed its doubt that "the *real* reason for this stop was a traffic violation." (Emphasis added.)

The trial court had the opportunity to observe the witnesses and then found that the officers' justification that a traffic violation warranted the stop was not a valid one. The court, as the trier of fact, had the discretion to believe or not believe the police officers' version of the events. *State v. DeHass* (1967), 10 Ohio St.2d 230, 39 O.O.2d 366, 227 N.E.2d 212, paragraph one of the syllabus. In light of this edict, the state's assignment of error should have been overruled. See *State v. Abkeimer* (1992), 83 Ohio App.3d 633, 615 N.E.2d 656 (based on credibility determination, trial court did not err in suppressing evidence where officer only assumed vehicle was speeding).

Moreover, in *State v. Gullett* (1992), 78 Ohio App.3d 138, 604 N.E.2d 176, the Highland County Court of Appeals recognized that the touchstone of the Fourth Amendment is reasonableness. *Id.* at 145, 604 N.E.2d at 180–181. The pertinent facts in *Gullett* were as follows: a Highland County Deputy Sheriff spotted a pickup truck driving down a highway at a lawful rate of speed at 2:30 a.m. in December 1990; the deputy followed the truck for about one and one-half miles; the truck "drifted over to the right and crossed the white edge line and then veered back into the lane of travel"; the truck then made a sharp right turn, consequently crossing the edge line which extended into the intersection; no other traffic was present; and there was no other abnormal or erratic driving beyond the crossing over of the edge lines. *Id.* at 140–141, 604 N.E.2d at 177–178. The driver of the truck, Gullett, was stopped and charged with violating R.C. 4511.33(A), movement from one lane to another on a divided roadway without first ascertaining whether such movement is safe, and R.C. 4511.19(A)(1), operating a motor vehicle while under the influence of alcohol or a drug of abuse. *Id.* at 141, 604 N.E.2d at 178.

Gullett filed a motion to suppress, which was partially premised on an unlawful stop of his vehicle. *Id.* The trial court granted the motion to suppress. *Id.* at 142, 604 N.E.2d at 178–179.

The state appealed the trial court's granting of the motion to suppress. In support of the appeal, the state argued that the two incidents of crossing the edge line justified the stop. The appeals court rejected this argument, and reasoned as follows:

"It is at least arguable that the center line and the edge line define the boundaries of a single lane in which a vehicle must be operated. Even so, it does

not follow that every crossing of the edge line, regardless of circumstances, constitutionally justifies a stop. Since a stop is *per se* unreasonable, it was incumbent on appellant [the state] to fully develop the circumstances to justify a non-warrant seizure. The evidence does not disclose if the initial crossing was only momentary or how far the line was crossed. * * *

"The touchstone of the Fourth Amendment is reasonableness. *Where a vehicle is driven on a roadway with no other traffic present, there was no speeding, erratic driving or other conduct, except for the edge line incident, to indicate that appellee was impaired, the balance is in favor of the right of privacy and against the need for the stop.* Based on the totality of the circumstances, we are not persuaded that sufficient articulable facts, and inferences therefrom, existed to constitutionally justify the stop." (Emphasis added.) *Id.* at 145, 604 N.E.2d at 180–181.

Therefore, even though the statute, R.C. 4511.33, requires that a vehicle be operated within boundaries of a single lane, every crossing of an edge line, regardless of circumstances, does not necessarily constitutionally justify a stop of the vehicle. The *Gullett* court found that the balance is in favor of the right to privacy and against the need for the stop when there was no other traffic present, or any other indication that the driver was incapable of operating his vehicle.

As applied to the instant case, assuming *arguendo* that Williams' vehicle was "impeding traffic," a fact the trial court rejected, the officers' nearly immediate stop of the vehicle was not warranted under the circumstances. Det. Garisek and Det. Nolan were in the area of East 140th Street and McElhattan, a "violent, high crime area," investigating mostly drug complaints. Det. Garisek testified that they turned the corner onto McElhattan, and immediately spotted a Chevette driven by Williams "parked" in the middle of the street. A mere fifteen seconds passed by prior to the activation of the overhead lights because the Chevette was "impeding the flow of traffic." Williams' vehicle was the only vehicle in the street; there were no vehicles approaching Williams' vehicle except for the detectives' vehicle. Det. Garisek furthermore did not observe any activity around the Chevette, *i.e.,* there were no pedestrians around the vehicle, or any other suspicious activity.

Just as the court stated in *Gullett*, I find it to be particularly true here that "[w]here a vehicle is driven on a roadway with no other traffic present, there was no speeding, erratic driving or other conduct, except for the [brief stop in the street], to indicate that appellee was impaired, the balance is in favor of the right of privacy and against the need for the stop." *Gullett*, 78 Ohio App.3d at 145, 604 N.E.2d at 180–181. As I stated *supra*, my opinion is that the trial court did not believe there was any traffic violation, but assuming there was, I still would have overruled the state's assignment of error based upon the reasoning in *Gullett*.

In conclusion, the totality of the circumstances in the present case leads me to conclude that these two detectives, who were out investigating drug complaints in a "violent, high crime area," had an agenda of their own. They used the alleged traffic violation as a ruse to approach the driver, and search his person and vehicle for evidence of a drug violation.

What is most perplexing to me about my conclusion is that the majority in the present case, as well as myself, recently came to a similar conclusion in *State v. Medlar* (1994), 93 Ohio App.3d 483, 638 N.E.2d 1105. We recognized therein that a police officer in North Olmsted, a non-high crime area, had an agenda of his own to use a parking violation as a ruse to approach a driver, search his person for evidence of intoxication, and seize him to conduct field sobriety and blood-alcohol content tests. The trial court was under the same impression in this case, and properly granted Williams' motion to suppress. The majority consequently fails to afford the appropriate deference to the trial court's findings and conclusion, and fails to observe what was obviously apparent to the trial court, that Williams was "set up" by the detectives.

Accordingly, I would have overruled the state's assignment of error and affirmed the trial court's decision.